## Robert Furman, *Appellant,*
## And Jesse Coe, Samuel Coe, and William Coe, *Respondents.*

On a discovery of new evidence after a decree in chancery, the application ought to be for a bill of review, and not for a rehearing. When the competence of witnesses examined is the cause of application, it ought to be by bill of review; when their credit, by articles. If an executor or trustee be robbed of trust money, it is a good answer to a bill for an ac-

ON appeal from Chancery. Robert Coe, the grandfather of the respondents, by his will empowered his executors, William Furman and William Howard, to sell and dispose of all his real and personal estate, *at such time as should be judged most advantageous for his children.* He directed also, *that his daughter Mary Coe's children* (the respondents) *should have the same quantity of money between them as their mother,* the said *Mary Coe, should have had for her portion, had she survived; that is, to be equal with the rest of his daughters, such share to be left in the hands of his executors, to bring them up.* On the death of the testator, Howard, refusing to act, William Furman alone proved the will; and in pursuance of the authority it contained, being about to sell the estate of the testator, some of the legatees who were of age objected to it, urging, that, from the then existence of the revolutionary war, the land would sell to a great disadvantage; and that, as several robberies had been committed in the neighbourhood, the keeping

the money it might bring would be attended with danger; but that if a sale was to take place, it ought to be at auction, as in that manner a higher price would be obtained. The executor, however, without attending to these remonstrances, proceeded in the disposition of the real and personal estate of the testator, which he sold in the month of May, 1779, at private sale, for £3158, of which sum the real estate produced £3000. On the 3d of August following, the executor divided the money arising from the sale among the legatees, according to their interests under the will, and took from those who were of age a receipt in full, for all their shares and proportions respectively; but the part belonging to the respondents, the eldest of whom was not then six years old, he, according to the directions of the will, retained in his own hands. In 1783, William Furman, the executor, died, and the appellant, his son, having administered on his estate, the respondents filed their bill against him, for the recovery of their legacies, under the will of Robert Furman. To this the appellant put in his answer, insisting on a total exoneration, in consequence of his father's house having been broken open by some robbers, who took away all the money then in his father's possession, including that belonging to the respondents, no part of which had ever been recovered. On the examination of witnesses, the fair character of the executor and the robbery were fully established. The testimony of one witness went to show a recovery of the money, from an acknowledgment of the executor in conversation with him. It was also in evidence, that William Furman had refused to advance to Susannah Coe, with whom the respondents lived, any thing for their support, saying no person should have money from their legacies, until they should come of age. It appeared also, that William Furman had let out the real estate of his testator for two years. Upon these circumstances, the Chancellor had decreed, to the respondents, their full proportion of the real and personal estate of Robert Coe, without any deduction; and also their proportion of two years rent of the real estate, with full interest on the whole, to be computed at the expiration of three months after the sale of the testator's property. After pronouncing this decree, the appellant presented a petition for a re-hearing, setting forth, that he had since discovered that two of the respondents' witnesses (whose depo-

ALBANY, 1804.

R. Furman, v. J. Coe & oth.

count. If the executor or trustee be dead, his personal representative may avail himself of it, tho' it want the corrobortaion of the oath of him whom he represents.

ALBANY,
1804.

R. Furman,
v.
J. Coe & oth.

sitions were read at the hearing of the cause) were, at the time of their examination, interested in the event; and that one of the respondents died before the hearing, having bequeathed his interest, under the will of Robert Coe, to the witnesses in question. The petition having been dismissed with costs, the appellant presented another for a re-hearing, in which he stated that Susannah Coe had, with two of the respondents, resided on the real estate of the testator, from May, 1778, till it was sold; and that, during the war, it was very difficult to put money out at interest; that when it could be done, it was at a very low rate; and that, at no time from thence to the present day, had money been loaned at 7 per cent. This petition being also dismissed with costs, the appellant appealed, as well from the orders thereon, as the decree in the cause. Bogert, for the appellant, having opened the case, his Honour the Chancellor proceeded to assign his reasons :

Mr. President—Four questions have been discussed in this case, as material to a decision between the parties. 1st, Whether the sale of the real estate by the executor was bona fide? 2d, Whether the fund, destined to the support and education of the complainants, was inequitably withheld? 3d, Whether robbery can legally operate to discharge an Executor? and 4th, Whether the evidence of the robbery in the present case is competent to his discharge on that ground? The will vested a liberal discretion in the Executors as to the time of sale. They were authorized to *sell the Testator's real and personal* estate, *at such time* as should be most advantageous to the children of the Testator.—He died in 1777; the sale of the real estate took place in 1779. It is perhaps difficult, at this late day, to appreciate with accuracy the motives to the sale, at the time it took effect. It was at a period of great public commotion; when the operations of contending armies had affected the value of real estates very essentially; when that species of property, from the circumstances of the times, and the repeated depredations of lawless men, was, however, to be preferred, as a permanent fund for the support of persons incapable of managing their own concerns, to the less secure investment of money. These considerations it seems were fully brought into the view of the executor, by the representations of some of the persons *beneficially* interested under the provisions of the will; they were disre-

garded, and the sale persisted in. Yet from a review of all the depositions, I think the rational result drawn from the whole collectively, is, that the Testator's real estate was not sold much below its value. Several of the witnesses depose positively to this. Those who differ, either mention in indefinite terms that it was sold below its value, or, if they define the sum, they connect the advanced price with a sale at auction, to which the executor was not bound to have recourse. This, combined with the circumstances that all the other devisees, capable of acting for themselves, immediately acquiesced, received their dividends of the consideration money, and executed acquittances, I think, may well be admitted to close the examination as to this point; for, though their acts generally cannot operate to the prejudice of the complainants, *on this point*, they speak an unequivocal language as to the fairness of the sale, as they are not even suspected of collusion with the executor. As to the second point, this is important in one view of the subject. For, if the executor, regardless of the obligation he had incurred by taking upon himself the execution of the will, refused to provide for the support and education of the complainants, he may be chargeable for such breach of trust. The complainants have specifically charged this refusal in their bill, and the defendant, in his answer, avows his ignorance of any advance, for that purpose, by his intestate. The will directed that the shares of the complainants (Mary's children) should be left in the hands of the executor *to bring them up*. The children, all the witnesses examined to that point concur, were of a very tender age, at the time of the death of the testator. Susannah Coe swears that she brought them up; that she lived within two miles of the executor; that she several times called upon him for some portion of their share of their grand-father's estate, for their support and education; that he positively refused, without assigning any reason, to advance any, till they arrived of age; that the complainants were in want of clothing, and other necessaries; that this was after the sale of the real estate, and after some of the devisees had been paid. Robert Moore, John Moore, Hezekiah Field, and Sarah Leverick, confirm the account of the infancy, destitute situation of the complainants, and their being supported by their grand-mother, aunt, or some other of their relations. The executor has been proved

ALBANY,
1804.

R. Furman,
v.
J. Coe & oth.

to have sustained a fair character, by all the witnesses examined to that point; but the circumstances of his retaining the fund destined to support and educate the orphans, whose interests had been committed to his charge; of his observing them thrown upon the bounty of their relations, destitute of clothing, and in want of necessaries of life, and this, in direct violation of the trust he had undertaken, are calculated to throw an air of suspicion on the whole subsequent transaction ; and, as far as part of the fund was necessary to be applied to their subsistence and education, it would clearly make him liable, whatever might be the consequences of the robbery as to the residue. As to the third point; in 2 Fonb. 191, it is laid down as a result deduced from the cases bearing on this question, that if a trustee be robbed, the sum lost by the robbery shall be allowed him in account, although the amount be proved only *by his own oath.* To fortify this rule, he cites the case of Morly and Morly, 2 Ch. Cases, 2, in which the robbery was proved, and the sum, by *the defendant's own oath.* In Co. Lit. 89, it is said, that if a guardian receive rent, and be robbed, if without his negligence and default, he shall be discharged.

4 Rep. 84. a. In Southcote's case, in account, it was held to be a good plea before the auditors, that the defendant was robbed. In Jones v. Lewis, 2 Vez. 241, there is the same doctrine, as to robbery being a discharge of the executors, if properly proved. These cases establish the doctrine, that if an executor be robbed without his default, the robbery being proved, he shall, by his own oath, be permitted to ascertain the sum lost, and shall be discharged as to such sum. It is therefore only necessary to test the evidence in the present case by that rule. The authorities cited permit the defendant to adduce the evidence of the robbery, and by his own oath to ascertain the extent of the loss ; but it is certainly not a necessary consequence of this rule, that, because a departing step has been taken from the strict line of evidence, by admitting the defendant's oath in his exoneration; therefore it is necessary to continue a progress in the same direction, by taking his declaration, unsanctioned by oath, as part of the evidence. The defendant in this case has stated the robbery positively. But he has connected with it the information, that he was absent from Long-Island during the whole of the war between the United States and Great-Britain, and thus conclusively evinced, that

the fact of the robbery was not asserted on his own knowledge of that circumstance, but collected from the information of others. That a robbery was committed, and some money stolen from the executor, seems to be pretty well established. The declarations of the executor, though contemporaneous, I think cannot be admitted as evidence; but if they could, those declarations are so inconsistent with each other, as, even admitting their validity, generally to establish the point, to fail of that effect here. All the witnesses, however, speak of *his* declarations only without any pretension to personal acquaintance with the circumstances of the robbery, excepting Abigail Rhodes, Mary Boss, and Robert Drummond, who were in the house of the executor on the night the robbery was committed; they also agree that the house was broken open by a party of men armed and disguised. Abigail Rhodes deposed, that 8 or £900 in cash was carried off, besides some articles of silver; that part of the money so carried off, " was money " received of the estate of Robert Coe, deceased, and then " in the hands of William Furman, senior, as executor of that " estate." Upon her cross-examination she declares, " that " some part of the money of which the said William Furman " was robbed, belonged to himself, some to the brother of " the said William, and that a considerable part belonged to " the estate of Robert Coe, deceased; *that all the money of* " *which the said William was robbed,* was kept in a strong *chest*, " in an upper chamber, at the time of the said robbery ; that " the money was in gold and silver, and was contained in " bags." She then proceeds to relate, that the executor was sent for to New-York, to attend the trial of some soldiers for the robbery; that a purse containing 60 guineas was shown to him, and he was required to identify it, which he could not. Mary Boss deposes, that the party robbed the executor *of all the money in the house;* that she was present and saw the robbers carry off the bags containing the money. Upon her cross-examination she says, that the money of which the executor was robbed, was *kept in a chest in an upper room;* that it consisted of hard money, and was contained in bags; that she saw the robbers bring the said bags down stairs, and carry them away; that she knew not the quantity of money, having never seen it counted ; that she was at that time employed by Mrs. Furman to spin. Robert Drummond

ALBANY, says, that the latter end of September, or beginning of Octo-
1804. ber, 1779, when the robbery was committed, he lodged at the
R. Furman, executor's; that he saw one of the robbers force open a chest,
v. and take from it a bag; that another broke open a closet, and
J. Coe & oth. came out with three bags, which he supposed contained mo-
ney, as it rattled; that the executor, after the robbers were
gone, observed, that £300 of the money belonged to some or-
phan children, of the name of Coe; *that he had offered the
money to the relations of those children, telling them it was trou-
blesome times, and that he did not wish to run any risk in keep-
ing the money.* Abigail Rhodes particularizes the several
owners of the money, and mentions the executor, his brother,
and the estate of Robert Coe, as composing those owners;
all this money she says was put in *bags*, in a *strong chest*, in
an upper chamber. Mary Boss says they took *all* the money
*in the house*, which she also says was in *a chest in an upper
room*, and that it consisted of hard money, *and was* contained
in bags. If all this money described by these two witnesses
was in bags and contained in a chest, Robert Drummond's
testimony shows, that the whole of the money from this chest
was not taken; for he expressly declares that only *one bag*
was taken out of the chest, and three others from the closet;
and as the chest contained money of three several persons,
and probably in distinct parcels; from these depositions con-
trasted, it would appear, that though a bag of money was ta-
ken from the chest, it might not be the one containing the
money of the complainants; these considerations, and the de-
claration of the executor deposed to by John Moore, that he
had got it back again, and the one made by him, related by
Sarah Leverick, *that some money had been left in every draw-
er*, superadded to which, the inconsistent declarations of the
intestate at different times, show, that it is totally impracti-
cable to identify the money of the complainants in the hands
of the executor, as the money stolen; here the extraordinary
interposition of the executor's oath might attach the loss to
the fund in controversy; but without that, it is clear the dis-
charge cannot be made out. I am therefore of opinion, that
the defendant, who has admitted assets, is liable for the
amount of the proportions of the complainants, and that it
ought to be paid with interest, which is a very inadequate
compensation for the privations which the complainants have

experienced by the non-application of the fund to their support and education. I take it therefore it must be referred to a master to settle the account, in doing which he ought to charge the defendant with the one-tenth part of the production of the real and personal estate of the testator; with these complainants $\frac{1}{7}$ of the shares of Elnathan and James, with the $\frac{1}{5}$ of Aletta's share, with interest on each sum from three months after the sale, deducting the money paid for her maintenance, with the share of the complainants in the personal estate of the testator, calculating the personal property at the selling, and not at the appraised value, and with the complainants' proportion of the two years rent of the testator's real estate with interest.

Riggs for the respondents. Before the counsel opens on behalf of the appellant, we shall state that it was agreed in the court below, that the suit should proceed, notwithstanding the death of one of the respondents. That circumstance, however, was available of, only by way of bill of revivor*, and cannot be urged now, because in appeal, nothing can be insisted on which was not offered below. 1 Har. Ch. 454. We shall contend also, that re-hearings are applications to the discretion of the court, similar to those for new trials; and that, as in the one case, a writ of error will not lie for a refusal, so an appeal cannot be maintained in the other, for dismissing. 3 P. Will. 8 †. And further, that if the appellant was entitled to any re-investigation below, it ought to have been sought by bill of review, and not by a petition for a re-hearing. 1 Har. Ch. 450.

Bogert. On the first point made below, we have nothing to complain. The Chancellor's decision has put that at rest. But as to the interest with which we have been charged, we cannot be liable for it, unless it appear we have made the fund productive. It is in evidence it could not be put out, except with great difficulty; and allowing it could, it is settled an executor is not bound to do it. 2 Fonb. 184—5 ‡. Besides, the executors were ordered to retain in their hands; whilst doing this, the robbery takes place, and this is from principle, as well as necessity, a full exoneration. 2 Fonb. 177—8. 2 Vez. 240 §. If the facts that a robbery was committed, and the money never recovered, were dubious, an issue ought to have been directed. To object, that the appellant's father did not prove the sum taken from him on oath, is

ALBANY, 1804.

R. Furman, v. J. Coe & oth.

* It has been said that no defendant, nor any who represents him, can revive before decree signed and enrolled. Glenham v. Statville, 2 Ch. Rep. 195. See Mitf. Treat. 26, 7, 8.

† Mills v. Banks.

‡ See the authority.

§ Jones v. Lewis.

·ALBANY,
1804.

R.·Furman,
v.
J. Coe & ·oth.

* Ivie v. Ivie.
† Palmer v.
Jones.

‡·Sammers v.
Rickman.

§ Vernon v.
Vaudry.
** S. C. cited
there, that a
trustee who is
guilty of a
breach of
trust, is liable
to his cestui
que trust.
†† Piety v.
Stace. A trus-
tee using trust
money in the
funds, &c.
shall be charg-
able with in-
terest. The
demand, how-
ever, of the
cestui que
trust, is only
a simple con-
tract debt, un-
less acknow-
ledged by the
trustee under
hand and seal.
Gifford v.
Manley, Fo-
rest. 109.
‡‡ 1 Lex.Mer.
Amer. 392.

but of little force; for as at that time, and till his death, no courts were sitting, it was impossible to swear to that circumstance in any legal and efficacious manner. The appellant himself could not do it, but in the manner in which he has done, according to the best information and belief. It is only in case of gross neglect, an executor standing in the relation of trustee, is ever made liable in chancery. 1 Atk. 430 *. The proof against him must be very strong. 1 Vern. 144 †. And that for fear of discouraging people from undertaking burthensome trusts. 2 Ves. J. 37 ‡.

Riggs and Hoffman contra. In support of the decree, we shall contend, that previous to the robbery, the executor was guilty of a most palpable breach of his trust, and so converted the fund; any subsequent loss, therefore, was of his own property, for which we are not to suffer. Barnard, 303 §. 2 Fonb. 169, n. (b **.) 4 Ves. J. 620 ††. The very sale was in violation of his duty. It was at a time when property was low; and when even the product could not, as is stated by the answer of the appellant himself, be put out to interest; this too contrary to urgent remonstrances. · In addition to these observations, the refusal to apply the portions of the respondents in bringing them up according to the directions of the will, was clearly a breach of trust, and a conversion of the fund pro tanto. This, upon the principle before laid down, renders the trustee answerable for the whole; and for this we have an authority in the case of Le Guen v. Gouverneur & Kemble ‡‡ in this very court. As to the residue of the decree, we repose ourselves on the doctrines and reasons it contains §§.

Troup and Benson in reply. If the court does not reverse in toto, they will at least order an issue to be directed. On the fact of robbery, there is no doubt. · The only question is, as to the recovery of the money. If the proof of that is deficient, a jury is the proper tribunal, unless the court think it established that it was never regained. As to the case of Le Guen v. Gouverneur & Kemble, that turned on this point. The defendants refused to give the plaintiff an authority to re-

§§ Both the counsel went into very elaborate and lengthy examinations of the testimony in the cause, but as the decision in the court below, and the opinions in this, contain the essence of the whole, to insert the ingenious arguments delivered, would not elucidate the point, how much soever they might evince the talents of the speakers.

●eive his money, to which he was entitled, and which he did not claim, but subject to their lien, after deducting fully its amount. The cases are by no means parallel. By the decision of the Chancellor, interest is ordered, though the robbery is allowed. This is acknowledging the misfortune, yet inflicting a punishment; for interest is given against a trustee by way of mulct or penalty. In this respect, therefore, the decree is clearly wrong. So, in allowing the rents of the real estate for two years to be taken into the computation. Till the estate was sold, the rents * belonged to the heir at law; for to him the estate descended till the time of sale.

Spencer, J. It is proper that I first consider, whether the proceedings on the petitions presented by the appellant for a re-hearing of the cause, after a decree settling all the principles, and the dismissing those petitions, is warranted by the course of proceedings in the court of chancery. It appears to me, that the Chancellor disposed of those petitions correctly; for, as has been insisted on by the respondents' counsel, instead of asking a re-hearing, on the discovery of new evidence, the application ought to have been for a bill of review, upon which the competency of the two witnesses, Hezekiah Field and Susannah Coe, would have been directly in issue. It was, however, not necessary to have filed articles; and in Callaghan v. Rochfort, 3 Atk. 643, Ld. Hardwicke decided, that articles were improper, when the objection was to the competency of the witnesses; but when to their credit, they were proper. The question, as to the interest of money upon Long-Island during the war, was certainly a question to which the appellants examined witnesses; and it cannot, with any propriety, be pretended, that ·he discovered testimony as to the rate of interest, of which he had no knowledge before the passing of publication, or the decree. But, upon any grounds which may be assumed, as the application to the Chancellor was for a re-hearing, in my opinion, the appellants' counsel mistook their remedy, and the Chancellor very properly dismissed the petitions. In making up my opinion, therefore, I have rejected all the exceptions to the testimony of the two witnesses, Hezekiah Field and Susannah Coe. The first question presenting itself, is, whether there is testimony enough to warrant the court in saying, there was a robbery? And, upon this head of the inquiry, without at all re-

*margin notes:*

ALBANY, 1804.

R. Furman, v. J. Coe & oth.

* The rule is, that where the real estate is to be sold at all events, and turned into personalty, the rents go as the land would. See Cruse v. Barley, 3 P. W. 20, and the note of Mr. Cox. But if the product of the .and be to be divided between certain legatees, some of whom die during the life of the testator, a resulting trust will arise, as to their shares, in favour of the heir at law,

P

ALBANY,
1804.

R. Furman,
v.
J. Coe & oth.

2 Fonb. 181.

garding what Wm. Furman said, there cannot remain a doubt. It is proved by the depositions of three witnesses, who were present at the time the robbery was perpetrated. Abigail Rhodes, Mary Boss, and Robert Drummond, depose to the facts. They relate the circumstances, and agree in the principal occurrences more correctly than is common for three persons, who are deposing to an incident twenty-three years after it has happened. There can exist no reasonable ground on which to doubt the robbery. The Chancellor was impressed with its having taken place; and in truth, the respondents' counsel admitted it. The next important points of inquiry are, 1st, Whether the money which had been paid by Mr. Titus to the executor of Robert Coe, Wm. Furman, and which appertained to the respondents, was part of the money whereof Mr. Furman was robbed? and, 2d, Whether this money was ever recovered by Furman? The law on the subject of bailments, and with respect to the responsibility of factors and trustees, is as firmly settled as on any other subject which can be presented. If the nature of the bailment or trust be such, that the bailee or trustee is to have no reward for his services, the law will not require of him any greater diligence than he usually exercises with regard to his own property; and it seems well established, " that if a trustee be " robbed of the money he received, he shall be allowed it on " account, the robbery being proved, although the sum is only " proved by his own oath; for he was to keep it as his own; " so in case of a factor, for he cannot possibly have other " proof." And it was correctly said on the argument, by one of the appellants' counsel, that it would be bringing an executor, in whom the testator reposes such especial confidence, to a test too severe, when he has proved a robbery, to require of him an identification of the money belonging to the cestui que trust. Such severity would well nigh deter any man from assuming a station of such responsibility, upon the calls of friendship, and without any possible advantage to himself. It is objected, that William Furman, the executor of Robert Coe, never made oath, either as to the robbery, or to the identity of the money belonging to the respondents. It has been answered, and I think satisfactorily, that there is no mode pointed out for a trustee, under his situation, to have pursued. Had he made an affidavit, it would have been extra-judicial,

and of no more importance than his own declarations. He could not resort to a court of chancery; because, from the time of the robbery, until very near the time of his death, which was in 1783, that court was shut. What means could he have pursued under the then state of things, which he did not? I confess myself at a loss to perceive any neglect on the part of William Furman, in that respect. If, then, William Furman could not avail himself of an opportunity to make the oath, which most certainly will, in cases of this kind, protect a person, as to the amount of the sum robbed, what shall we require of him that he did not do? It appears from the deposition of Robert Drummond, that immediately after the robbers had retired, William Furman went with him up stairs, where it is agreed, by all the witnesses, the money was deposited; and that he then stated to Drummond the amount to be £900; that £300 belonged to some orphan children, of the name of Coe; and that he was an executor for the children. Abigail Rhodes, who, from her situation and relationship to William Furman, being his daughter, may be presumed to know, states in positive terms, " *that a part of the mo-* " *ney of which* the said William Furman was robbed, as afore-" said, was money received of the estate of Robert Coe, de-" ceased, and then in the hands of the said William Furman, " senr. as executor of that estate." Mary Boss, who is spoken of as Polly Thompson, also resided in the family of William Furman. She states, that he was robbed of all the money he had in the house; and that the next morning she heard him say, that all the money belonging to the grand-children of Robert Coe was taken by the said robbers, together with his own. Mrs. Rhodes could only speak of the money belonging to the respondent; because, on the third of August before the robbery, the other legatees had been paid their proportions of the proceeds of the real and personal estate. It appears to me, that, from these facts, taken collectively (and I know of nothing to detract from them) it must be manifest, that the money belonging to the respondents, and in the hands of William Furman, was taken by the robbers, together with his own. Did William Furman recover this money? The only witness who establishes this fact is *John Moore*. His character appears to be fair; to his declaration, therefore, great weight is to be attached. He says, " that he heard

" William Furman say, he had been robbed of a certain sum
" of money, but that the robbery had been detected, and the
" money recovered; and that he had got the same again."
To believe this to be correct, is also to believe William Fur-
man to have been a most profligate and abandoned character.
That he was otherwise, appears from the confidence reposed
in him by Robert Coe, and the proof that he was a man of
good character.   It is to be again remembered, that John
Moore is speaking to a conversation more than twenty years
past; and it would be going too far, to believe that he did
not labour under some mistake, when the testimony opposing
this fact shall have been considered and weighed.   If Wil-
liam Furman made the declaration imputed to him by John
Moore, there can be no satisfactory reason assigned, why it
should have been confined to Moore alone; and most cer-
tainly his own family would have been informed of such sin-
gular good fortune.   Robert Drummond states, that he was
sent for to appear as a witness before the court-martial, on the
apprehending some men charged with the robbery.   He did
appear, but could not identify the robbers, in consequence of
which they were remanded; but he never heard or under-
stood, that the money, or any part of it, had been restored.
This witness had the best means of knowing the fact of the
recovery of the money, had it happened.   This testimony,
though negative, in my opinion affords a strong presumption
that it never was reclaimed.   Abigail Rhodes and Mary Boss
both unite in declaring, that they never heard that any part of
the money taken by the robbers had been recovered; and it is
inconceivable, if the fact had been otherwise, that they should
not have heard of it from Mr. Furman.   John Gosper as-
serts, that he heard Mary Boss some years afterwards say,
" that William Furman had been very lucky, for that he had
" recovered all the money he had been robbed of, except a
" small part."   This declaration she denies ever having
made; and, admitting that it detracts from her credibility, for
having asserted facts not under oath, which she denies when
under oath, still the testimony of Drummond and Mrs.
Rhodes remains unimpeached.   *Howard Furman*, who ap-
pears to have lived in the neighbourhood, heard of the robbery
the day after it was committed, but never heard that the mo-
ney was recovered.   Benjamin Coe was told of the robbery

in 1783, by William Furman; and that he had been to New-York, on the apprehending some soldiers suspected, but he told him he could get no account of the matter. Joseph Robinson was told in 1783, by William Furman, of the robbery; and that it amounted to £900, of which 5 or £600 belonged to him. He says nothing of its having been recovered. *Thomas Burroughs* says, he was informed by William Furman of the robbery; and that he had been sent for to New-York to fetch the money; but he did not fetch it, as the person having the charge of it had gone to Kingsbridge. *Susannah Coe* says, she has heard William Furman say he was robbed of a purse of money; that he had seen the purse and the money again in New-York; and th t the person in whose charge it was had gone to Kingsbridge. It is manifest, that the last witness, to say the least of her, must have been mistaken; for, from the testimony of Drummond and the other witnesses, the money was in bags; and it is somewhat remarkable, that Mr. Furman could have seen the purse and money, when the person in whose charge it was, was absent at Kingsbridge. The testimony of Joseph Burroughs presents nothing but the vaguest hearsay, and deserves no consideration. Upon the whole, from the strictest examination of the evidence in my power, it appears to me, that the weight of evidence is decidedly in favour of the appellant; that the money was not recovered: therefore I am for reversing the decree, and dismissing the bill of the respondents with costs in that court. I have not noticed the pretended breach of trust, on the part of William Furman, in disposing of the real estate of Robert Coe at private, rather than public, sale. The testimony in the cause abundantly shows, that his conduct was fair and honest. If he really misjudged, in either the time or mode of selling, it will not warrant me in saying, contrary to the proof, that he was guilty of a breach of the trust reposed in him. There are other minor points in the cause, the decision of which is rendered unnecessary, by the opinion I have given. There is one thing yet to be noticed: it is alleged by Susannah Coe, that she applied to William Furman for money to purchase necessaries for the children, and that he refused, saying, " that no person should " have money, on account of those legacies, until the children " were of age." This, it has been contended, was a conversation of the whole; or, in other words, that he became answer-

ALBANY,
1804.

R. Furman,
v.
J. Coe & oth.

able for the whole amount in his hands, if it was afterwards robbed, and never recovered. The testimony of Mrs. Coe, on this point, is very loose and inconclusive. She furnishes no dates; and it is impossible to say, whether her application was before or after the robbery. But to this there is a further answer, that Mrs. Coe had no right to make the demand, unless she was guardian to the children, which she appears not to have been. Mr. Furman's refusal to an unauthorized person cannot, therefore, in law, draw after it the consequences which have been contended for.

Livingston, J. The questions in this cause are principally questions of fact. They involve the robbery of the intestate, and the subsequent recovery of the money. That William Furman was robbed, can admit of no doubt; the testimony to this point is full and conclusive. His Honour the Chancellor regarded it in that light; nor can any who will read the depositions entertain a different opinion. The want of Furman's own oath (which indeed could not have been taken, except in an extra-judicial way) is abundantly supplied by other proof. There is as little difficulty in determining that the money of the complainants was taken, as well as his own. Some of the witnesses, who establish the robbery, expressly state that part of the money of which he was robbed belonged to the estate of Robert Coe, deceased. Considering the manner of the robbery, which was perpetrated in the night, by several armed men, who must of course have had a complete control over the dwelling-house and all its inhabitants, it is not probable they left any money, worth speaking of, behind. Whether the money was regained, is a question of more difficulty; and yet on the proof before us, my opinion would be in the negative. There is no one witness, except John Moore, who deposes affirmatively on this point; and although a man of character, it is probable either that he has committed some mistake, which would not be extraordinary, after so great a lapse of time, or that some circumstance is omitted, as to time and place, which would give a very different complexion to his testimony. Perhaps the declaration of Furman, which he speaks of, was made after he had heard of the detection of the robbers, and when he of course expected to recover the money. Some explanation is wanted from this witness to reconcile his testimony with the declaration of the other witnesses, and the conduct of Furman to other persons. How

happens it, that none of the persons who resided in his family
ever heard this money was recovered, or that Furman, who
bore the character of an honest man, never mentioned so im-
portant a circumstance to any but Mr. Moore? or that the re-
covery of this money did not become a matter of as great, or
indeed greater, notoriety in the neighbourhood, than the rob-
bery? The money could not have been returned in secret. It
would have been known to many; it would have been the
subject of conversation throughout the neighbourhood; it
would not have been in the power of an artful man to have
suppressed a knowledge of such an incident. An honest
man, as Furman was, would have had no motive to attempt it.
But notwithstanding the strong inclination of my opinion in
favour of the appellant on this point, it is one of those cases
which ought to be submitted to a jury. A more full and
satisfactory examination can thus take place, and there will
be less danger of error in that way, than if we take the deci-
sion of it upon ourselves. My opinion therefore is, that his
Honour the Chancellor be ordered to direct a feigned issue to
be tried between the parties at common law, to determine
whether any and what part of the monies of which William
Furman, as executor to the last will and testament of Robert
Coe, deceased, was robbed, during the late war between the
United States and Great-Britain, was at any time and when
recovered by him; and that all further directions be reserv-
ed, until the trial of such issue. Some complaint was made
against the sale of the real estate. This complaint was with-
out cause. The Chancellor considered it so; and I entirely
concur in this part of his opinion. The sale was fair, well in-
tended, for a full value, and I think well-timed. Although mo-
ney produced little or no interest on Long-Island, during the
war, the farm would not have yielded any great rent, and
might, and probably would, have suffered much. It was also
said that William Furman, by refusing to advance any money
to Susannah Coe, for the complainants' support, was guilty of a
breach of trust, and on the principle established in the case of
Le Guen and Gouverneur & Kemble, he became liable, from
that moment, for the whole fund in his hands, and that there-
fore no subsequent robbery could shield him from a responsi-
bility to that extent. I cannot perceive how the case cited
bears on the one under review. In Le Guen v. Gouver-

*ALBANY,*
*1804.*

*R. Furman,*
*v.*
*J. Coe & oth.*

neur and Kemble, nothing more was decided, according to my understanding of it, than that factors, who were in advance, and under heavy responsibilities for their principal, had no lien on his securities in their hands, and that in a special action on the case against them for misconduct, it was not only unnecessary in the plaintiff to prove a special damage, but incompetent for the defendant to show their principal had been benefited by this alleged misconduct.  If Furman was guilty of a breach of trust, it could only be for so much as was necessary for the support of these children; but that could not affect the surplus, which must have remained in his hands after advancing what Susannah Coe asked of him. It is however sufficient to say, that Mrs. Coe had no right to make this demand, and that it does not appear with sufficient certainty that it was made.

In this last opinion Kent, Justice, concurred, contra Lewis, C. J. who, with the majority of the court, being for a reversal, the decree was accordingly reversed in toto.